UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| JESSICA HODGES, et al. ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Case Number: 4:22-cv-00067-WTM-CLR |
| vs. ) | |
| ) | |
| CHATHAM COUNTY, GEORGIA, et al. ) | |
| ) | |
| Defendants. ) | |

**PLAINTIFFS' MOTION TO COMPEL AND MEMORANDUM IN SUPPORT**

NOW INTO COURT, through undersigned counsel, come Plaintiffs, pursuant to Rule 37 of the Federal Rules of Civil Procedure,[1] and respectfully request that this Court order the Defendants Chatham County, Georgia, Don White, and Karlos Manning ("County")[2] to provide documents and permit a deposition related to the County's investigation into the death of Lee Creely in the Chatham County Detention Center ("Jail").  The documents were created for business purposes, i.e., to administer and oversee the contract between CorrectHealth, the County, and sheriff to include a review of the clinical care provided to Mr. Creely and others who have died at the Jail.  The documents are not protected by any privilege the law recognizes and should be produced to Plaintiffs.  In addition, Plaintiffs should be permitted to depose Dr. Kenneth Ray, who reviewed Mr. Creely's medical chart and provided a report that was provided pursuant to a public records request.

In support, undersigned counsel states as follows:

---

[1] On Dec. 13, 2022, the parties attended a discovery conference before Judge Christopher Ray.  The Court permitted Plaintiffs to file motions to compel discussed during the conference on or before Jan. 13, 2023.

[2] On November 29, 2022, pursuant to stipulation agreed to by all parties, this Court dismissed without prejudice Alfred Nevels, who was originally a named defendant.  *R. Doc. 64*.

**INTRODUCTION AND STATEMENT OF FACTS**

This action is a conditions of confinement case against the County and other defendants for their deliberate indifference to Mr. Creely's serious medical needs and systemic failure to comply with the requirements of the United States Constitution at the Jail. *Doc. 8-1*. In early September of 2020, Lee Creely ("Mr. Creely") was a thirty-four (34) year old man with two children when he was arrested for violating his probation. The alleged violation was technical—failing to report his change of address—and the underlying conviction was for drugs and other non-violent crimes.

On September 3, 2020, at approximately 12:54 a.m., Mr. Creely entered the Jail and was booked. Mr. Creely admitted to an extensive history of drug addiction, including current use of Xanax and heroin, and staff for CorrectHealth—a private, for-profit medical provider hired by the County—prescribed treatment for withdrawals from both drugs. Nevertheless, people who worked at the Jail, including County staff—essentially ignored Mr. Creely as he died in his cell. *Id.*, pp. 18-20.

Generally, Plaintiffs allege that "Mr. Creely died as a result of both explicit and *de facto* policies and practices by the Defendants with responsibility for the health care and security provided to people detained in the Jail." *Id.*, pp. 9-10. In addition, Plaintiffs allege that "the Jail and its health care system are managed and operated in an unconstitutionally dangerous manner, with the health care system prioritizing profit over the health and safety of detainees." *Id*. Finally, Plaintiffs' claim that individual staff at the Jail were deliberately indifferent to Mr. Creely's suffering and that their individual actions were the policy of the Jail under *Monell*. *Id.*, pp. 33-38.

Even though the County and Chatham County Sheriff's Office together contracted with CorrectHealth for the provision of health care to people detained in the Jail, *see, e.g., Exhibit 1*, p.

1344 (contract between Chatham County, Ga., the Chatham County Sheriff's Office, and CorrectHealth), it is the County who bears the responsibility for paying CorrectHealth. *Id.*, p. 1353. In addition, it has assumed responsibility for the "administration of" the contract. *Id.*, p. 1345. The County assigned assistant county manager Michael Kaigler as the Project Manager. *Id.*

The contract provides that "[a]uthorized representatives of the County may at all reasonable times review and inspect the activities required under" the contract. *Id.*, p. 1346. The County has the right to terminate the contract with CorrectHealth for cause or convenience. *Id.*, p. 1347. CorrectHealth must make its records available for audit and inspection to both the County and sheriff. *Id.*, p. 1350. Per the contract, CorrectHealth "shall" provide health care to people detained in the Jail as specified in their response to the County's request for proposal # 17-0109-1. *Id.*, p. 1358.

According to public reports, the County delegated at least some of its responsibility to administer and oversee the CorrectHealth contract to ensure the provision of health care to people detained in the Jail, including Mr. Creely, to the Community Oriented Correctional Health Services, known as "COCHS." As part of their work, COCHS issued eleven (11) written reports, which were all made public in a September 4, 2019, exposé by Reuters. *See,* https://www.reuters.com/investigates/special-report/usa-jails-monitor/ (interactive investigative news report discussing CorrectHealth's contract with the County and sheriff, with links to all 11 COCHS reports warning the County and sheriff that CorrectHealth had "staff shortages, unclear health guidelines and failures to give inmates prescribed medications." Such failings, they warned, could trigger "potential loss of life."). The reports are entirely factual or opinions based on fact, and offer no legal advice or legal opinions. *Exhibit 2*. According to Reuters, around October of 2017, COCHS was fired. https://www.reuters.com/investigates/special-report/usa-jails-monitor/

According to the County's privilege log, late in the summer of 2018 COCHS was replaced by Dr. Kenneth Ray to help monitor the CorrectHealth contract. *See* R. Doc. 68-3 (County's privilege log, beginning with a report by Dr. Ray dated Aug. 14, 2018). The privilege log only claims the attorney-client privilege for the documents listed, does not claim attorney work product privilege, and only lists six (6) of the COCHS reports. *Id.* The log does not list the damning, but entirely factual, medical chart review dated September 29, 2020 of Mr. Creely's CorrectHealth records. *Compare id.* with *Exhibit 3*.[3]

Dr. Ray found "no documentation that demonstrates adherence to the treatment protocols ordered by the treating provider. In fact, there is no documentation to demonstrate that the inmate received attention by health care staff after the protocols were initiated." *Exhibit 3*, p. 1. It continued that [s]everal existing health care policies were not followed." *Id.* Tragically, Dr. Ray provides the factual opinion that Mr. Creely's "death was likely preventable if existing health care policies and standard protocols would have been followed as written and ordered." *Id.*

**The Discovery Requests and Responses**

On May 3, 2022, Plaintiffs submitted Requests for Production of Documents to the County. *Exhibit 4*. On June 2, 2022, Defendant submitted their responses. *Exhibit 5*. On October 18, 2022, Plaintiff narrowed one of the requests for documents. *Exhibit 6*. On December 7, 2022, the parties met and conferred, *see, Exhibit 7* (Utter email to the County's counsel), and agreed that the requests that form the basis of this motion are based on Plaintiff's 1st Request for Production of Documents, as modified by the parties by communications:

> **No. 12:** Any administrative review, mortality or morbidity investigation or review, psychological autopsy, or similar, relating to any detainee death from January 1, 2017 through December 31, 2020.

---

[3] The Ray report was provided by the sheriff's office in response to a routine public records request made by Plaintiffs' counsel. *See, Exhibit 3* (affidavit of Kimberly Griffin, paralegal with the Claiborne Firm, open records correspondence with sheriff's counsel, and Ray report).

**No. 21:** All reviews, audits, annual reports, technical assistance reports, evaluations, assessments, and/or grand jury reports relating to the Jail or on any major components of the Jail (medical services or mental health services, for example) from January 1, 2016 through December 31, 2020.

In addition, the County objects to the following 30(b)(6) deposition topics:

--Contract negotiations and budget preparation, including staffing levels, for the contract(s) with Community Oriented Correctional Health Services; and

--Contract negotiations and budget preparations, including staffing levels, for the contract(s) with Dr. Kenneth Ray.

Finally, the County seeks a protective order barring the deposition of Dr. Ray. *R. Doc. 68.*[4] On December 12, 2022, the County produced a privilege log. *R. Doc. 68-3*. The parties met and conferred but were unable to resolve this discovery dispute. *Exhibit 7*. Pursuant to LR26.5, I certify that a good faith effort has been made to resolve the dispute before coming to court. *Exhibit 8*.

## LEGAL ARGUMENT

I.  **Standard of Review**

The attorney-client privilege protects confidential communications between the client and the attorney for the purpose of obtaining legal advice. *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). "The party invoking the attorney-client privilege has the burden of proving that an attorney-client relationship existed and that the particular communications were confidential." *United States v. Schaltenbrand*, 930 F.2d 1554, 1562 (11th Cir. 1991). To be protected by privilege, the "privilege holder must prove the communication was (1) intended to remain confidential *and* (2) under the circumstances was *reasonably* expected and understood to be

---

[4] Even though the request for a protective order is no longer pending, *R. Doc. 72*, at the Dec. 13, 2022, discovery conference counsel for the County indicated they intended to object to Dr. Ray's deposition being taken based on privilege. Plaintiffs file this motion to compel in accordance with the agreements reached at the discovery conference.

confidential." *Bogle v. McClure*, 332 F.3d 1347, 1358 (11th Cir. 2003) (internal quotations omitted) (emphasis in original). "To carry its burden, a party must show 'that the primary purpose of the communication was to relay, request or transmit legal advice.'" *Gibson-Carter v. Rape Crisis Ctr.*, 4:19-cv-122 (S.D. Ga. May 29, 2020); 2020 U.S. Dist. LEXIS 94424, *26 (quoting *United States v. Davita*, 301 F.R.D. 676, 682 (N.D. Ga. 2014). Neither the existence of an attorney-client relationship nor the mere exchange of information with an attorney make out a presumptive claim." *Covey v. Colonial Pipeline Company*, 336 F.R.D. 514, 519 (N.D. Ala. 2020) (citations omitted).

The attorney work product doctrine "offers qualified protection for materials that are: (1) a document or a tangible thing, (2) prepared in anticipation of litigation, and (3) by or for a party, or for his representatives." *Bridgewater v. Carnival Corp.*, 286 F.R.D. 636, 639 (S.D. Fla. 2011). "The law is clear that if documents are prepared for a business purpose, or for some other non-litigation purpose, they fall outside the protection of the work product doctrine." *Id*. at 641.

Whether a party asserts attorney-client privilege or work-product privilege, the "burden of sustaining a claim of privilege is a 'heavy' one." *Gibson-Carter*, 2020 U.S. Dist. LEXIS 94424 at *26 (quoting *Bridgewater.*, 286 F.R.D. at 639). "Plainly, 'the burden is not . . . discharged by mere conclusory or *ipse dixit* assertions, for any such rule would foreclose meaningful inquiry into the existence of the relationship, and any spurious claims could never be exposed." *Gibson-Carter*, 2020 U.S. Dist. LEXIS 94424 at *27 (quoting *Bridgewater.*, 286 F.R.D. at 639) (internal quotations omitted)).

## II. The Mortality Review of Mr. Creely is Not Shielded by Attorney-Client Privilege

### A. The Mortality Review Does Not Constitute Confidential Legal Advice under Precedent

1. CorrectHealth Policy Mandates a Mortality Review Be Conducted for Every Jail Death to Improve Care Regardless of Potential Litigation

Rather than being a communication seeking legal advice about a particular situation at the Jail, it is CorrectHealth's policy that "[a]ll inmate deaths will be reviewed to determine the appropriateness of clinical care." *Exhibit 2*, p. 1. The purpose is to determine whether modifications or improvements need to be made. *See id.* (Death reviews are done to "ascertain whether changes to policies, procedures, or practices are warranted; and to identify issues that require further study."). The Jail's Health Care Administrator is required to implement any "Corrective Action Plan developed as a result of the mortality review" and the results of the review are to be discussed with treating healthcare staff. *Id.*, p. 2.

CorrectHealth policy governs the timing and personnel involved in the mortality review. *See, id.,* ("An on-site multidisciplinary mortality review will be conducted within 30 (thirty) days of the incident on all [deaths on-site or in custody]." The class of deaths to be reviewed is very wide, with virtually any death that could have happened on CorrectHealth's watch subject to a mortality review. *See, id.*, p. 2 (reviews are not only for on-site deaths, but deaths "of inmates in custody, but located off-site (hospital, another facility, work release" and deaths "of individuals within one week of release from custody" from the Jail.).

CorrectHealth policy also governs the subject matter of the mortality review. It "will evaluate administrative and clinical aspects surrounding the death. When suicide is the cause of death, a psychological review will be included in the overall process." *Id*. "If multiple deaths occur at one facility, a special mortality review will be conducted to determine whether any patterns require further study." *Id*. Again, nowhere in CorrectHealth's policy is it stated that a mortality review is done only if litigation is anticipated. *Exhibit 2*.

CorrectHealth's Health Services Adminstrator at the time of Mr. Creely's death, Karen Forchette, testified at her deposition that there are essentially two purposes for the mortality review: to get information about the death down "while it's fresh in everyone's – the events are fresh in people's memories, to get those down on paper" *see, Exhibit 3, P. 21, L. 13-19* (relevant part of Forchette deposition transcript), and to "notify our legal department." *Id., P. 23, L. 2-3*. CorrectHealth's policy, and its staff's understanding of that policy, makes clear that the mortality review and its contributing documents were not done for "the purpose of securing legal advice or assistance." *United States v. Schaltenbrand*, 930 F.2d at 1562.

### 2. The Mere Fact that An Attorney Authored and/or Reviewed the Mortality Review Does Not Create Privilege

The involvement of an attorney in drafting or reviewing a document does not bring it under the ambit of privilege. Instead, the party asserting privilege must show "irrespective of whether one or more lawyers sent or received the communication, that the communication was confidential and that the primary purpose of the communication was to relay, request or transmit legal advice." *U.S. ex rel. Baklid–Kunz v. Halifax Hosp. Med. Cen.*, 6:09–cv–1002–Orl–31TBS, 2012 WL 5415108, at *4 (M.D.Fla. Nov. 6, 2012).

Here, as discussed above, mortality reviews are prepared in every Jail death "to determine the appropriateness of clinical care." *Exhibit 2*, p. 1. These reviews are compiled by interviewing Jail staff, medications, medical records, and other factual inquiries. The mere fact that the mortality review's author was an attorney does not protect it. Indeed, in analogous circumstances, Judge Davis in this district found that a review of facts that was written by an attorney was not privileged. *See Gibson-Carter*, 2020 U.S. Dist. LEXIS 94424, *26-31. There, a former employee sued for racial discrimination and retaliatory firing. *Id*. at *20-21. Prior to her termination, the Defendants hired a law firm who conducted an "independent investigation" into various issues

regarding plaintiff's employment.  *Id*. at *17.  An attorney wrote a summary of the law firm's investigation and distributed to defendants, which was subsequently forwarded to plaintiff.  *Id*. at *16-18.  Portions of the summary were pled in the plaintiff's Complaint, which the defendants moved to strike as violating attorney-client and work product privilege.  *Id*. at *21-22.

Rejecting this argument, Judge Davis reasoned "the fact that [the attorney] provided the email and report to Defendants does not necessarily prove that communications were privileged; rather the Court must examine the work performed by [the attorney] and the substance of at-issue documents to determine whether attorney-client privilege applies."  *Id*. at *27.  After reviewing the contract between the attorney and defendants, Judge Davis stated that the attorney's work "appears to be more akin to personnel or human resources investigation . . . and less akin to advice on legal issues."  *Id*. at *28.  Judge Davis ultimately held that such a document is not privileged.  *Id*. at *29-31 (citing *Jackson v. Deen*, 4:12-cv-139 (S.D. Ga. July 25, 2013); 2013 U.S. Dist. LEXIS 107593, *5 (for the proposition that privilege does not apply where an attorney is employed as more than a legal advisor such as "in oversight and investigatory activities").

A mortality review is analogous.  It is based on interviews with witnesses to determine what medically occurred and how to improve care.  It is written regardless of litigation.  Having a lawyer write it cannot create an automatic shield as defendants claim.

### B. There was No Reasonable Expectation the Mortality Review Would Remain Confidential as They Are Routinely Ordered Disclosed in §1983 Actions

To be attorney-client privilege, the communication must "*reasonably* expected and understood to be confidential."  *Bogle*, 332 F.3d at 1358.  Disclosure of mortality reviews have been repeatedly the subject of litigation—including by CorrectHealth—and continually ordered to be disclosed.  Thus, there can be no reasonable expectation of confidentiality.

Mortality reviews are useful evidence in civil rights cases involving deaths in a Jail. As one court recently noted:

> [I]t appears that the Review offers what is likely the most cohesive timeline of events that Plaintiff could likely hope to receive in this matter. It also speaks directly to medications and interventions given, or not given, to [the decedent]. The information in the Mortality Review is important, if not critical, to Plaintiff's case, which contains Counts for deliberate indifference of a serious medical need in violation of Plaintiff's Fourteenth Amendment Rights; *Monell* claims against the Sheriff and Cook County for failures to train, supervise, and discipline employees with respect to emergency medical situations; and a state claim for indemnification."

*Johnson v. Dart*, 309 F.Supp.3d 579, 582 (N.D. Ill. 2018) (citations omitted). Plaintiff, of course, raises almost identical issues in this case. *Doc. 8-1*.

Similarly, in another case brought by relatives of a detainee who died in the custody of a county jail, a federal judge in Georgia, in a particularly well-reasoned opinion, observed the following:

> There are unique considerations at play in a post-death investigation ordered by a county jail...A review of a deceased inmate is not the straightforward evaluation of medical care that occurs in the civilian context. The generation of post-death reports, including the one at issue in this case, may include details such as when jail officials notified medical officials of a particular problem, and whether there was a reason for non-medical officials to have monitored a situation more closely. The report may verify the fact that a jail official failed to notify medical personnel. Not only is this type of information "nonmedical," but it is also [*sic*] may shed light, or at least raise an inference, of jail customs or policies.

*Jenkins v. DeKalb Cnty., Georgia*, 242 F.R.D. 652, 660 (N.D. Ga. 2007). *See also Estate of Belbachir v. County of McHenry*, No. 06 C 01392, 2007 WL 2128341 at *6-*7 (N.D. Ill. July 25, 2007) (observing, in case arising from the death of a detainee, that "unofficial, defacto [*sic*] practices and customs within the jail are much more difficult to expose," since "evidence of unconstitutional policies and customs may not exist outside of the confines of a post-death consultation of jail personnel."). Other courts have held that where, as in the instant matter, the "civil rights of inmates suffering from mental health problems" are at issue, public policy demands

that discovery be permitted to obtain the mortality review report. *Weiss ex rel. Estate of Weiss v. County of Chester*, 231 F.R.D. 202, 206-07 (E.D. Pa. 2005). Finally, another of Georgia's federal courts found the *Jenkins* decision "particularly on point" involving a CorrectHealth mortality review. *See, e.g., Colardo-Keen v. Rockdale County, Georgia*, 2017 WL 4418669, *2, Civil Action No. 1:14-CV-489 (N.D. Ga. Mar. 3, 2017) (CorrectHealth's mortality review discoverable in wrongful death lawsuit).

The documents at issue involve a public jail that uses public money to provide health care to pretrial detainees. The standard of care in the Jail and the causes of death are important public knowledge. Put another way, "[w]hereas in the ordinary hospital it may be that the first object of all involved in patient care is the welfare of the patient, in the prison context the safety and efficiency of the prison may operate as goals affecting the care offered. . . . [I]t is particularly important that the public have access to the assessment by peers of the care provided." *Agster v. Maricopa Cnty.*, 422 F.3d 836, 839 (9th Cir. 2005).

The fact that these reviews have been ordered disclosed before—indeed over the objection of this very defendant—vitiates any notion that these materials were going to remain confidential.

**III.     Work Product Privilege Does Not Apply to Mortality Reviews**

Neither CorrectHealth's "Mortality Review Form" and the final mortality review, among other documents, are protected by the attorney work product doctrine. *Exhibit 8*. The first question to be determined is whether the documents were created for a business purpose. "The law is clear that if documents are prepared for a business purpose, or for some other non-litigation purpose, they fall outside the protection of the work product doctrine." *Bridgewater*, 286 F.R.D. at 641. Again, based on CorrectHealth's policies and its contract with Chatham County and Sheriff Wilcher, CorrectHealth performs mortality reviews on "[a]ll inmate deaths . . . to determine the

appropriateness of clinical care." *Exhibit 2*, p. 1. The purpose is to determine whether modifications or improvements need to be made. *See id.* (Death reviews are done to "ascertain whether changes to policies, procedures, or practices are warranted; and to identify issues that require further study."). Nowhere in its policies does CorrectHealth state that mortality or other reviews of deaths in the Jail are done in anticipation of litigation. *Id.*

While it is true that if litigation is the "primary motivating purpose behind the creation of the document" then the attorney work product doctrine applies. *U.S. v. Davis*, 636 F.2d 1028, 1040 (5th Cir. 1981). In *Davis*, attorneys challenged subpoenas for documents related to their work preparing tax returns and business documents for their client, an accused drug dealer. *U.S. v. Davis*, 636 F.2d at 1032. The lawyers claimed the documents were attorney work product. The Fifth Circuit disagreed, noting "papers generated by an attorney who prepares a tax return are not within the work product privilege simply because there is always a possibility that the IRS might challenge a given return." *Davis*, 636 F.2d at 1040. Plaintiffs allege that at least four (4) people died in the jail under CorrectHealth's watch prior to Mr. Creely's death. *R. Doc. 8-1, p. 30*. In addition, Plaintiffs filed their lawsuit over a year after Mr. Creely's death. *Id.* The mortality review and documents requested in discovery were not "even colorably prepared in anticipation of this or any other litigation." *Davis*, 636 F.2d at 1040.

## IV.     CONCLUSION.

CorrectHealth prepares mortality reviews for deaths at the Jail as a matter of course in its business pursuant to its policies and procedures for quality improvement. It does not create the documents for the purpose of securing legal advice or in anticipation of litigation; the mere fact that a lawyer is present does not create a privilege. Plaintiffs respectfully request that this Court grant the motion to compel.

Respectfully submitted, this 13th day of January, 2013.

/s/ *David J. Utter*
DAVID J. UTTER
Bar Number: 723144
WILLIAM R. CLAIBORNE
Bar Number: 126363
THE CLAIBORNE FIRM, P.C.
410 East Bay Street
Savannah, Georgia 31401
(912) 236-9559 Telephone
(912) 236-1884 Facsimile
david@claibornefirm.com
will@claibornefirm.com
Attorneys for Plaintiffs

/s/ *Christopher J. Murell*
CHRISTOPHER J. MURELL
Bar Number: 195116
MURELL LAW FIRM
2831 St. Claude Ave.
New Orleans, LA 70117
(504) 717-1297 Telephone
chris@murell.law
Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served on all counsel of record and filed electronically with the Clerk of Court's CM/ECF system.

This 13th day of January, 2013.

/s/ *William R. Claiborne*
WILLIAM R. CLAIBORNE