# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
### SAVANNAH DIVISION

JESSICA HODGES, as natural )
guardian of minor children, L.C. )
and D.C, and ESTATE )
OF LEE MICHAEL CREELY, )
  )
       Plaintiffs, )
  )
v. )      CV422-067
  )
CHATHAM COUNTY, GEORGIA, )
*et al.*, )
  )
       Defendants. )

## ORDER

Currently before the Court are Plaintiffs' Motion to Compel Defendants Chatham County, Georgia, Don White, and Karlos Manning (the "County Defendants"), doc. 88, and Plaintiffs' Motion to Compel Defendants CorrectHealth, LLC, CorrectHealth Chatham, LLC, Carlo Musso, MD, Karen Forchette, and Jacqueline (Jackie) Harned (the "CorrectHealth Defendants), doc. 90.[1]  The County Defendants and the

---

[1] Plaintiffs notified the Court of the disputes as required by the undersigned's Standard Procedures for Discovery Disputes. *See* doc. 65. After holding an informal discovery dispute conference, the Court authorized Plaintiffs to file their motions to compel.  Doc. 71 (Minute Entry).  Therefore, Plaintiffs have complied with the conditions precedent to filing discovery motions under the Federal Rules of Civil Procedure and the Local Rules of this Court.

CorrectHealth Defendants have responded to the respective motions. Docs. 91 & 92.  Plaintiffs have replied in support of their Motion to Compel the County Defendants.  Doc. 96.  Despite notifying the Court of their intent to reply in support of their Motion to Compel the CorrectHealth Defendants, doc. 94, Plaintiffs have not filed a reply.  *See generally* docket; *see also* S.D. Ga. L. Civ. R. 7.6.  The Motions are ripe for disposition.

## I.   BACKGROUND

Plaintiffs seek damages for alleged constitutional violations, under 42 U.S.C. § 1983, and wrongful death under Georgia law related to the death of Lee Michael Creely while he was incarcerated at the Chatham County Detention Center ("CCDC").  *See generally* doc. 8-1 at 9-39. Chatham County contracted with CorrectHealth Chatham, LLC to provide inmate healthcare services at the CCDC.  *See, e.g.*, doc. 88-6. Plaintiffs allege the defendants, who are either affiliated with Chatham County or CorrectHealth, are liable for Creely's death.  *See generally* doc. 8-1.  They summarize their allegations as follows:

> Generally, Plaintiffs allege that Mr. Creely died as a result of both explicit and *de facto* policies and practices by the Defendants with responsibility for the health care and security provided to people detained in the Jail.  In addition,

> Plaintiffs allege that the Jail and its health care system are managed and operated in an unconstitutionally dangerous manner, with the health care system prioritizing profit over the health and safety of detainees.  Finally, Plaintiffs claim that individual staff at the Jail were deliberately indifferent to Mr. Creely's suffering and that the Defendants established and maintained policies, patterns, and practices that provided inadequate health care to individuals in the Jail.

Doc. 88 at 3; doc. 90 at 2 (quoting doc. 8-1) (internal punctuation and citations omitted).

During discovery, a dispute arose between Plaintiffs and the County Defendants regarding the discoverability of reports prepared by Community Oriented Correctional Health Services ("COCHS") and Dr. Kenneth Ray about CorrectHealth's provision of health care at CCDC. *See generally* docs. 88 & 91.  The County Defendants also challenge Plaintiffs' attempt to depose Dr. Ray and object to two of Plaintiffs' proposed 30(b)(6) topics.  *See* doc. 88 at 6-7.  A separate dispute arose between Plaintiffs and the CorrectHealth Defendants regarding the discoverability of "documents related to CorrectHealth's investigation into the death of Lee Creely," doc. 90 at 1, which the CorrectHealth Defendants contend are protected "legal communications and work product," doc. 92 at 1.  Plaintiff filed motions to compel against both Chatham County and the CorrectHealth Defendants related to these

3

disputes.  *See generally* docs. 88 & 90.   Discovery is stayed pending
resolution of these two motions.  Doc. 72.

## II.    MOTION TO COMPEL CHATHAM COUNTY (Doc. 88)

### A.    Discovery Requests and Documents at Issue

Plaintiffs' discovery dispute with the Chatham County Defendants
centers on claims of attorney-client privilege and attorney work product
protection over documents responsive to Plaintiffs' discovery requests.
Plaintiffs' First Set of Requests for Production of Documents ("Document
Requests") to the Chatham County Defendants, as modified by the
parties' communications, seeks:

> No. 12: Any administrative review, mortality or morbidity
> investigation or review, psychological autopsy, or similar,
> relating to any detainee death from January 1, 2017, through
> December 31, 2020.

Doc. 88 at 6; *see also* docs. 88-7 at 13; 88-9 at 1.  The County Defendants
agreed to "produce any non-privileged documents in their possession that
are responsive to this request."  Doc. 88-8 at 5.  Plaintiffs dispute that
any privilege protects the documents requested.  *See, e.g.*, doc. 88-9 at 2-
3.

The Document Requests also sought:

> No. 21: All reviews, audits annual reports, technical assistance reports, evaluations, assessments, and/or grand jury reports relating to the Jail or on any major components of the Jail (medical services or mental health services, for example) from January 1, 2016, through December 31, 2020.

Doc. 88 at 6; *see also* doc. 88-7 at 14.  In their initial response, the Chatham County Defendants objected that this request "is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence."  Doc. 88-8 at 8.  Although not raising a privilege challenge in their response, the parties' subsequent communications demonstrate that the County Defendants' actual objection is "based on attorney-work product."  Doc. 88-10; *see also* doc. 91-5.  Despite asserting such an objection, the County Defendants' privilege log indicates that all of the documents listed are withheld on the basis of "Attorney Client Privilege."  Doc. 68-3 at 1-3.

Along with the Document Requests, Plaintiffs have identified two 30(b)(6) deposition topics to which the County Defendants object "based

on attorney work product." Doc. 88-10 at 2; *see also* doc. 88 at 6. The

objectionable topics are:

- Contract negotiations and budget preparation, including staffing levels, for the contract(s) with Community Oriented Correctional Health Services[.]
- Contract negotiations and budget preparations, including staffing levels, for the contract(s) with Dr. Kenneth Ray.

*Id.* The County Defendants also object to Plaintiffs' attempts to depose

Dr. Ray, arguing he is "a legal consultant for the County Attorney." Doc.

91 at 3-4; *see also* doc. 88 at 7.[2]

Before turning to the parties' arguments over the applicability of

attorney-client privilege or the attorney work product doctrine, it is

important to identify the documents, or categories of documents, in

dispute. The parties' presentation of their dispute suffers from a

significant lack of precision. The deficiency is likely a direct result of the

County Defendants' incomplete and insufficient privilege log. *See* doc.

68-3. As this Order explains in more detail below, the Court has

identified four categories of documents meriting discussion: (1) 11 reports

---

[2] Plaintiffs served a subpoena on Dr. Ray for a deposition on December 13, 2022. Doc. 91-4 at 4. Chatham County filed a motion to quash the subpoena. Doc. 68. During a discovery conference, the parties agreed that the motions to compel currently before the Court supersede the Motion to Quash. *See* doc. 72. Therefore, the prior Motion to Quash was terminated. *Id.*

prepared by COCHS regarding CorrectHealth's provision of services at the CCDC (the "COCHS Reports"), *see* doc. 88 at 5; *see also* doc. 88-12 at 2-93 (unredacted COCHS Reports filed under seal); (2) Dr. Ray and Dr. Shansky's review of Creely's medical charts titled "Death Chart Review Issues Identified" and dated September 29, 2020 (the "Creely Report"), *see* doc. 88-12 at 94-112 (unredacted Creely Report filed under seal); (3) a July 20, 2019 "Inmate Mortality Chart," related to a different deceased inmate, provided by the County Defendants for *in camera* inspection (the "2019 Inmate Mortality Chart"); and (4) 14 Inmate Health Compliance Monitoring Reports authored by Dr. Ray (the "Ray Compliance Reports"), *see* doc. 68-3 at 1.  The Court will also discuss the Plaintiffs' request to depose Dr. Ray, and the Plaintiffs' request to depose Chatham County on topics related to its "contract negotiations and budget preparations" with both COCHS and Dr. Ray.

### 1.    *COCHS Reports*

Chatham County previously used COCHS to assist it in overseeing CorrectHealth's provision of services at CCDC.  *See generally* doc. 88-12 at 3-93.   COCHS periodically visited the CCDC and reported its observations.  *See generally id.*  In response to a Georgia public records

request from the media company Reuters, someone affiliated with Chatham County disclosed copies of eleven COCHS Reports. *See* doc. 88 at 5. Reuters published an article about the CCDC explicitly referencing the reports and explaining that Reuters obtained them through an open records request. Doc. 88-4 at 7. The County Defendants' privilege log identifies six of the eleven reports. *See* doc. 68-3 at 2. However, they now concede that any privilege that may have applied to the COCHS Reports was waived when Sheriff Wilcher sent the reports to Reuters.[3] Doc. 91 at 20. Any dispute over the COCHS Reports' discoverability in this case appears to be resolved.

Plaintiffs insist that the County Defendants' concession does not thwart their assertion that the documents were never protected by attorney-client or work product privilege. Instead, they urge they "should be able to inquire into the genesis and nature of the County's contracts with COCHS" and "request confirmation that the publicly

---

[3] Plaintiffs rightly point out that the County Defendants' failure to include five of the COCHS Reports on their privilege log could result in a determination that any arguable privilege over those reports was waived. *See* doc. 88 at 2 n.4 (citing *Meade v. General Motors, LLC*, 250 F. Supp. 3d 1387, 1393 (N.D. Ga. 2017) (recognizing that "[t]he court may impose as a sanction the waiver of privilege . . . by . . . failing to provide an adequate privilege log in compliance with Rule 26.")). The County Defendants' concession that any arguable privilege was waived by the prior disclosure renders Plaintiffs' argument on this point moot.

available COCHS reports are all that exist, and if more exist that they be produced." Doc. 96 at 3, n. 4.  The Court agrees.  In making its concession, the County Defendants failed to respond to Plaintiffs' arguments about the discoverability of the COCHS Reports and the "[c]ontract negotiations and budget preparations, including staffing levels, for the contract(s) with Community Oriented Correctional Health Services."  *See* doc. 88 at 6, 9-13; *see also* doc. 91 at 20.  Therefore, they have not carried their burden of demonstrating that what Plaintiffs seek relative to the County's relationship with COCHS is protected by any privilege or work product protection.  *See, e.g., Diamond Resorts U.S. Collection Dev., LLC v. US Consumer Attys, P.A.*, 519 F. Supp. 3d 1184, 1197, 1200 (S.D. Fla. 2021) (explaining the burdens for the party asserting privilege or work product protections).  Plaintiffs may inquire into these topics during the 30(b)(6) deposition of Chatham County, and the County Defendants must identify and produce any other responsive COCHS Reports they have not already produced.  The Plaintiffs' Motion to Compel is, therefore, **GRANTED**, **IN PART**.  Doc. 88, in part.

## 2.     *Dr. Ray and Dr. Shansky's Creely Report*

According to the Chatham County Attorney, he hired Dr. Kenneth Ray to "review[ ] issues occurring at the jail to ensure that the Sheriff's Office has an expert in the area of medical contract compliance and civil rights protections."  Doc. 91-1 at 3-4.  Pursuant to that arrangement, Dr. Ray prepares reports which the County Attorney contends are related to "possible litigation issues and issues with Correcthealth and contract compliance" which Dr. Ray then discusses with the County Attorney, the County Manager, and the Sheriff.  *Id.* at 4.

Dr. Ray and his associate, Dr. Shansky, prepared one such report after Creely's death.  Doc. 91-1 at 4; *see also* doc. 88-12 at 94-112 (Creely Report).  That report was provided by Dr. Ray to the County Attorney who then discussed it with the County Manager and the Sheriff.  Doc. 91-1 at 4.  It was to be kept confidential since, according to the County Attorney's characterization, it includes "opinions on what legal violations, if any, may have occurred at the Detention Center by the medical provider, and what additional steps need to be taken to investigate the matter further."  *Id.* at 5.  It was not, however, kept confidential.

Prior to initiating this case, Plaintiffs' counsel's office sought documents related to Lee Michael Creely from the Sheriff through a Georgia Open Records Act request. *See* doc. 88-5 at 2; *see also id.* at 6-7. In response, the Sheriff, through the Chatham County Attorney's Office, produced two "jump drives containing documents and video." *Id.* at 2; *see also id.* at 8-9. Among the documents provided was a copy of the Creely Report. Doc. 88-5 at 2; *id.* at 10-27 (redacted report); *see also* doc. 88-12 at 94-112 (unredacted report filed under seal).

Each party provided a copy of the Creely Report for an *in camera* inspection. Plaintiffs contend the Creely Report is responsive to their document requests and not privileged, and even if it were privileged, the disclosure has waived the privilege. *See* doc. 88 at 13-15. They also seek to depose Dr. Ray regarding the Creely Report. *Id.* at 13; *see also* doc. 96 at 11 (asserting "Plaintiffs have a right to depose Dr. Ray"). The County Defendants argue the report is privileged, inadvertent disclosure notwithstanding. *See, e.g.*, doc. 91 at 14-15.[4] The Court addresses these arguments below.

---

[4] Plaintiffs contend the Creely Report does not appear on the County Defendants' privilege log. *See* doc. 88 at 2, n. 4. The County Defendants do not specifically respond to this contention. *See generally* doc. 91. Their privilege log includes two entries titled "Inmate Mortality Chart," which are each described as a "Report" authored by

### 3.    *2019 Inmate Mortality Chart*

Along with the Creely Report, the County Defendants provided for *in camera* inspection a copy of another report authored by Drs. Ray and Shansky related to another inmate's death at the CCDC.  That inmate's death occurred on July 20, 2019, so the Court presumes—although it is not clear—that the document provided is the 2019 "Inmate Mortality Chart" listed on the County Defendants' privilege log.  *See* doc. 68-3 at 3; *see also supra* n. 4.  Based on the privilege log, the County Defendants assert that it is protected by the attorney-client privilege.  Doc. 68-3 at 3. Unlike the Creely Report, the 2019 Inmate Mortality Chart has not been publicly released.  *See, e.g.*, doc. 88 at 2 n. 4; doc. 91-1 (County Attorney's affidavit explaining that "Dr. Kenneth Ray's reports are confidential"). The parties briefing on the discoverability of the 2019 Inmate Mortality Chart suffers from some of the same problems as those identified below related to the Ray Compliance Reports.  However, since the County

---

"Dr. Kenneth Ray" and received by "R. Jonathan Hart."  *Id.* at 3.  One entry includes a date, "07/20/2019," and one does not.  *Id.*  Neither entry includes any other identifiers.  *Id.*  It is, therefore, difficult—if not impossible—to discern whether the County Defendants intended to include the Creely Report on the privilege log.  It is, at least to the Court, an open question whether the undated "Inmate Mortality Chart" listed on page three of the privilege log is intended to identify the Creely Report, or another "Inmate Mortality Chart."  Intentions notwithstanding, as this Order explains in more detail below, the entry is woefully deficient.

Defendants provided a copy of the document itself for inspection, the Court is not left completely in the dark.  The document appears responsive to one of Plaintiffs' discovery requests.  Moreover, the parties' arguments on the applicability of any protections to "reviews of deaths . . . made to evaluate and review medical care," *see* doc. 88 at 14, apply equally to the 2019 Inmate Mortality Chart.  In the interests of efficiency, the Court will, therefore, analyze whether the document provided for the Court's review is protected from discovery by any of the theories advanced by the County Defendants.[5]  *See, e.g.*, Fed. R. Civ. P. 1.

### 4.   *Ray Compliance Reports*

The final category of documents possibly at issue, the Ray Compliance Reports, encompasses 14 "Inmate Health Compliance Monitoring Reports," authored by Dr. Ray and received by the Chatham County Attorney, listed on the County Defendants' privilege log (the "Ray Compliance Reports").  *See* doc. 68-3 at 1.  The parties' briefing on the status of these 14 documents is unclear, at best, and nonexistent, at

---

[5]  Given the confusing nature of the parties' identification—or nonidentification—of the relevant documents, and to avoid any confusion about what the Court has reviewed, the Clerk is **DIRECTED** to maintain a copy of the 2019 Inmate Mortality Chart, provided by the County Defendants for an *in camera* inspection, on the docket sealed and *ex parte*.

worst.  Plaintiffs' motion refers generally to "documents created by Dr. Ray," *see* doc. 88 at 15, but it is not clear whether they intended to refer to the Ray Compliance Reports.  The motion specifically addresses the COCHS Reports, *see* doc. 88 at 9-13, and the "Medical Chart Review by Dr. Kenneth Ray of Lee Creely's Medical Records," *id.* at 13-15.  It never specifically addresses the Ray Compliance Reports.  *See generally id*.  The County Defendants' briefing confusingly refers to "Dr. Ray's reports" but other than specific reference to the Creely Report does not identify those "reports."  *See generally* doc. 91; *see also* doc. 91-1 at 4 (County Attorney's affidavit discussing "Dr. Kenneth Ray's reports in the Lee Creely fatal overdose death").  Plaintiffs' reply focuses solely on the Creely Report. *See generally* doc. 96.  Neither party provided copies of the Ray Compliance Reports for an *in camera* inspection.

Absent any specific discussion by either party about the discoverability of the Ray Compliance Reports, the issue is not properly before the Court.  Consistent with the parties' briefing, the Court will only analyze whether the Creely Report or the 2019 Inmate Mortality

Chart, discussed above, are subject to production.[6]  The Court will also address the Plaintiffs' contentions that Dr. Ray must appear for a deposition, *see* doc. 88 at 13-15, and that they are entitled to explore the contractual relationship between Dr. Ray and the County during the County's 30(b)(6) deposition, *see id.* at 6.  To be clear, the Court will not discuss the Ray Compliance Reports again in this Order.[7]

### B.   Analysis

"The Federal Rules of Civil Procedure strongly favor full discovery whenever possible." *Farnsworth v. Procter & Gamble Co.*, 758 F.2d 1545, 1547 (11th Cir.1985).  The Rules instruct that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . . ." Fed. R. Civ. P. 26(b)(1).  Plaintiffs make a compelling showing that the Creely Report and the 2019 Inmate Mortality Chart meet that standard.  *See* doc. 88 at 2-4 (summarizing

---

[6]  As indicated above, the County Defendants' concession regarding the COCHS Reports resolves the issue of the discoverability of the COCHS Reports and any related deposition testimony.

[7]  If the parties' intended for the Court to opine on the discoverability of the Ray Compliance Reports, they did not sufficiently present the issue for a determination. They are reminded that "district court[s] . . . are not required to ferret out delectable facts buried in a massive record . . . ." *Chavez v. Sec'y Fla. Dept. of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011).  Since the issue was not raised, any party seeking its resolution must comply with all the pre-filing requirements for discovery motions imposed by the Federal Rules and this Court's standing orders.

claims); *see also* Fed. R. Evid. 401 ("Evidence is relevant if . . . it has any tendency to make a fact [of consequence in determining the action] more or less probable than it would be without the evidence[.]").  Defendants do not contend that either are irrelevant.  *See generally* doc. 91. Therefore, Plaintiffs are entitled to the Creely Report and the 2019 Inmate Mortality Chart unless the County Defendants can meet their burden of establishing that a privilege or the work product doctrine exempts them from discovery.  *Republic of Ecuador v. Hinchee*, 741 F.3d 1185, 1189 (11th Cir. 2013).

### 1.   *Attorney-Client Privilege*

The County Defendants' privilege log asserts the attorney-client privilege as the sole basis for withholding documents.  *See* doc. 68-3.  As a threshold matter, the parties dispute what law governs the County Defendants' claims of attorney-client privilege.  *Compare* doc. 91 at 4-6 *with* doc. 96 at 5-7.  A claim of privilege in federal court is resolved by federal common law, except "in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision." Fed. R. Evid. 501.  The County Defendants argue the Plaintiffs' state law wrongful death claim triggers application of Georgia attorney-

client privilege law.  Doc. 91 at 5.  Plaintiffs argue the gravamen of their Complaint is their federal constitutional claims, and therefore federal common law should apply.  Doc. 96 at 6-7.

This case was removed to this Court based on its federal question jurisdiction.  *See* doc. 1 at 2.  Although neither party cites to it, in *Hancock v. Hobbs*, the Eleventh Circuit held that "the federal law of privilege provides the rule of decision in a civil proceeding where the court's jurisdiction is premised upon a federal question, even if the [evidence] is relevant to a pendent state law count which may be controlled by a contrary state law of privilege."   967 F.2d 462, 467 (11th Cir. 1992) *abrogated on other grounds by Jaffee v. Redmond*, 518 U.S. 1 (1996); *see also Meyer v. Gwinnett Cnty. Police Dep't*, 2022 WL 2439590, at *7 (11th Cir. July 5, 2022) ("Because jurisdiction in this case was based on [Plaintiff's] federal § 1983 claim, the federal law of privilege applies to the supplemental state law counts as well."); *Jenkins v. DeKalb Cnty., Ga.*, 242 F.R.D. 652, 655 (N.D. Ga. 2007) ("[E]ven in a case such as this, where the Plaintiffs are alleging violations of state law in addition to violations of federal law, federal courts look to federal law to determine the applicable privileges."); *Buckler v. Israel*, 2014 WL 6460112, at *1

(S.D. Fla. Sept. 25, 2014) ("Here, because this case involves a federal question involving an alleged violation of civil rights by law enforcement, federal privilege laws govern the discovery dispute at hand."). Based on that authority, Plaintiffs are correct and federal law governs the application of any attorney-client privilege.

"The attorney-client privilege applies to 'confidential communications between an attorney and his client relating to a legal matter for which the client has sought professional advice.' " *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1262-63 (11th Cir. 2008) (quoting *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 252 (D.C. Cir. 1977)). "The party invoking the attorney-client privilege has the burden of proving that an attorney-client relationship existed and that the particular communications were confidential." *Bogle v. McClure*, 332 F.3d 1347, 1358 (11th Cir. 2003) (quoting *United States v. Schaltenbrand*, 930 F.2d 1554, 1562 (11th Cir.1991)) (internal quotations omitted).

"To carry its burden, a party [asserting the privilege] must show 'that the primary purpose of the communication was to relay, request or transmit legal advice,' " *Gibson-Carter v. Rape Crisis Ctr.*, 2020 WL

2815122, at *9 (S.D. Ga. May 29, 2020) (quoting *United States v. Davita, Inc.*, 301 F.R.D. 676, 682 (N.D. Ga. 2014)), and "must prove the communication was '(1) intended to remain confidential and (2) under the circumstances was reasonably expected and understood to be confidential,' " *id.* (quoting *Bogle*, 332 F.3d at 1358) (emphasis omitted). The privilege is narrowly construed. *See United States v. Noriega*, 917 F.2d 1543, 1551 (11th Cir. 1990).

The two documents at issue, both the Creely Report and the 2019 Inmate Mortality Chart, were created by Dr. Ray after reviewing the circumstances surrounding a CCDC inmate's death. Plaintiffs argue these documents were made for business purposes, specifically, to assist the County in administering and overseeing its contract with CorrectHealth. *See* docs. 88 at 1; 96 at 3. They further argue the reports "are made to evaluate and review medical care, as well as outline future improvement," and "there [was] no expectation that [the] report[s] would remain confidential." Doc. 88 at 14. Therefore, they argue, they are not protected by the attorney-client privilege.

Defendants respond with an affidavit from Chatham County Attorney R. Jonathan Hart, who attests he hired Dr. Ray for "litigation

support" to assist him in "the specialized field of medical contract compliance and the needs of the Sheriff's office to provide competent medical care to all inmates at the Detention Center." Doc. 91-1 at 3.  The County Defendants explain the reports created by Dr. Ray were "directed by the County Attorney's office to assess any deficiencies and legal issues surrounding the death of an inmate and to discuss the report with the Sheriff and the County Manager to review and ascertain any issues that the County Attorney would see as potential litigation issues and how to correct those issues." Doc. 91 at 10.  Since the reports are "only shared with the Sheriff and the County Manager, clients of the County Attorney," they argue they are "a communication between the County Attorney and his clients." *Id.*

The County Defendants' arguments miss the mark and reveal a fundamental misunderstanding of the scope of the attorney-client privilege.  "It is generally recognized that the communication of factual information is not protected by the attorney-client privilege, . . . [a]nd for investigations, communications, and the like that are of a nature that the business would ordinarily have conducted in all events, the privilege does not attach." *Meade v. General Motors, LLC*, 250 F. Supp. 3d 1387,  1392

(N.D. Ga. Apr. 21, 2017) (internal citations and quotations omitted).

Moreover, "simply funneling non-privileged information through an attorney does not automatically encase the document in the privilege." *U.S. ex rel. Baklid-Kunz v. Halifax Hosp. Med. Ctr.*, 2012 WL 5415108, at *3 (M.D. Fla. Nov. 6, 2012).  The reports created by Dr. Ray, who is not an attorney, do not become attorney-client privileged information simply because the County Attorney receives them.   Perhaps the County Attorney's comments to the Sheriff or the County Manager *about* the reports would be protected, or any questions from the Sheriff or the County Manager to the County Attorney seeking advice about the reports, but the reports themselves are not, because they are not "confidential communications between an attorney and his client relating to a legal matter for which the client has sought professional advice." *Miccosukee Tribe of Indians of Fla.*, 516 F.3d at 1262.  The "mere fact that [the County Attorney] is present at a meeting or is copied on [the reports] does not in and of itself afford privilege protection to [the reports]."   *In re Seroquel Prods. Liab. Litig.*, 2008 WL 1995058, at *2 (M.D. Fla. May 7, 2008) (quoting *Burton v. R.J. Reynolds Tobacco Co.,*

*Inc.*, 170 F.R.D. 481 (D. Kan. 1997)).  The documents at issue are not protected by the attorney-client privilege.

## 2.  *Work Product*

The more logical protection that the County Defendants argue applies to the reports is the work product doctrine.  It provides a qualified immunity for materials prepared in anticipation of litigation by a party, an attorney, or other representatives of the party.  *Hickman v. Taylor*, 329 U.S. 495 (1947).  The doctrine "is distinct from and broader than the attorney-client privilege, and it protects materials prepared by the attorney, whether or not disclosed to the client, *as well as materials prepared by agents for the attorney*."  *Fojtasek v. NCL (Bahamas) Ltd.*, 262 F.R.D. 650, 653 (S.D. Fla. 2009) (citing *In re Grand Jury Proceedings*, 601 F.2d 162, 171 (5th Cir. 1979)) (emphasis added).  Federal Rule of Civil Procedure 26(b)(3) incorporates the attorney work product doctrine discussed in the Supreme Court's seminal decision in *Hickman*.  *Hinchee*, 741 F.3d at 1189.  The Rule states: "Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative

(including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)."  Fed. R. Civ. P. 26(b)(3).[8]

Defendants argue Dr. Ray's reports are protected work product because "Dr. Ray is a consultant for the County Attorney's office and any reports he creates [are] done so at the direction of the County Attorney in anticipation of litigation."  Doc. 91 at 15.  They further explain that "[t]he Sheriff and Chatham County get[ ] lawsuits numerous times a month ranging in situations dealing with civil rights violations and deaths occurring at the Chatham County Detention Center" and therefore "the County Attorney is obligated to have staff at the Detention Center to monitor for compliance and investigate potential situations that could become a lawsuit."  *Id.* at 18.  Dr. Ray, they argue, fills this role.  *Id.*  Plaintiffs respond that "Ray simply factually reviews whether CorrectHealth is providing the level of medical care needed for people in the Jail," and his resulting reports are not protected.  Doc. 96 at 4.

Whether Dr. Ray's reports are protected work protect turns, in part, on whether they were created "in anticipation of litigation."  Fed. R. Civ.

---

[8] Unlike the attorney-client privilege issue, even in diversity cases the application of the work product doctrine is governed by the Federal Rules of Civil Procedure.  *See Royal Marco Point 1 Condo. Ass'n, Inc. v. QBE Ins. Corp.*, 2010 WL 5161111, at *2 (M.D. Fla. Dec. 14, 2010).

P. 26(b)(3).  In analyzing claims of work product protections, this Court

has explained:

> A document will be deemed prepared in anticipation of
> litigation when: the document can fairly be said to have been
> prepared or obtained because of the prospect of litigation.  But
> the converse of this is that even though litigation is already
> in prospect, there is no work-product protection for documents
> prepared in the regular course of business rather than for
> purposes of litigation.

*Brantley Cnty. Dev. Partners, LLC v. Brantley County, Georgia*, 2021 WL

2678197, at *3 (S.D. Ga. June 29, 2021) (quoting *Castle-Foster v. Cintas

Corp. No. 2*, 2021 WL 601877, at *5 (S.D. Ga. Feb. 16, 2021) (internal

quotations omitted).   Documents are protected where "the primary

motivating purpose behind the creation of the document was to aid in

possible future litigation."  *Id.* (internal citation and quotations omitted).

Defendants carry the burden of showing the documents were prepared in

anticipation of litigation, a burden which is not discharged "by mere

conclusory or *ipse dixit* assertions."  *Montes v. Liberty Mut. Fire Ins. Co.*,

2023 WL 2743210, at *2 (M.D. Fla. March 31, 2023) (quoting *Bridgewater

v. Carnival Corp.*, 286 F.R.D. 636, 639 (S.D. Fla. 2011)).

The County Defendants have not met their burden of showing why

the two specific reports at issue, the Creely Report and the 2019 Inmate

Mortality Chart, were created in anticipation of litigation. They acknowledge that Dr. Ray serves multiple roles at the CCDC, including inspecting the jail to ensure CorrectHealth's compliance with its contractual obligations and to "improve . . .health measures." Doc. 91 at 20. The County Attorney's affidavit highlights that Dr. Ray provides "invaluable support in contract compliance." Doc 91-1 at 3. It states that Dr. Ray's reports are discussed among county representatives not only "as it relates to possible litigation issues" but also related to "issues with Correcthealth and contract compliance." *Id*. at 4. Even when specifically discussing the Creely Report, the County Attorney explains that Dr. Ray "prepare[d] an accounting of all legal issues in regards to Chatham County *and their contract with Correcthealth*." *Id*. (emphasis added). The County Defendants' own argument substantiates the Plaintiffs' contention that Dr. Ray was hired "to assist the County's administration and oversight of its contract with CorrectHealth." Doc. 96 at 3. Defendants, by providing multiple reasons for Dr. Ray's reports, do not carry their burden of showing the primary motivating purpose of the two reports at issue as aiding in possible future litigation. They are,

25

therefore, not protected from disclosure by the work product doctrine enshrined in Rule 26(b)(3).

### 3.   *Waiver*

Even if the attorney-client privilege or work product doctrine did apply to the two reports at issue, at least as to the Creely Report, Plaintiffs argue that any privilege that ever applied was waived when "[t]he sheriff's lawyers voluntarily provided Dr. Ray's report to [Plaintiffs' counsel's paralegal] via Georgia's public records act[.]" Doc. 88 at 14.  The County Defendants do not dispute that a copy of the Creely Report was disclosed in response to Plaintiffs' counsel's pre-suit request; however, they argue the "involuntary disclosure" does not act as a waiver.  *See, e.g.*, doc. 91 at 9.

Again, as a threshold issue, the County Defendants argue that Georgia law should apply to the question of any waiver, since the document at issue was produced in response to a Georgia state law open records request made pre-discovery.  *See* doc. 91 at 11-14.  It is unclear how consideration of Georgia law would be required under the so-called "fairness doctrine of Rule 26," which the County Defendants invoke but do not support with any citation to authority.  Doc. 91 at 12.  Additionally,

they later cite to *Eden Isle Marina, Inc. v. United States*, 89 Fed. Cl. 480 (2009).  *See* doc. 91 at 13-14.  In that case, the Court of Federal Claims acknowledged that the documents were disclosed "during plaintiff's counsel's investigation of plaintiff's claims prior to filing suit . . . and not expressly 'in a Federal proceeding' as contemplated by the rule," but nevertheless found it "appropriate to apply the rule."  *Eden Isle Marina*, 89 Fed. Cl. at 501 n. 20.  The scant authority cited does not support the requested application of Georgia law.

Remarkably, Defendants do not address the scope of any waiver under Federal Rule of Evidence 502(c), which specifically addresses disclosures "made in a state proceeding."  *See* Fed. R. Evid. 502(c). Absent any argument that Rule 502(c) is applicable here, and absent any argument that it would result in an application of Georgia's waiver laws, the Court will not construct those arguments on the County Defendants' behalf.  *See Fils v. City of Aventura*, 647 F.3d 1272, 1284 (11th Cir. 2011) ("[D]istrict courts cannot concoct or resurrect arguments neither made nor advanced by the parties."); *see also* S.D. Ga. L. Civ. R. 7.1 ("[E]very motion filed in a civil proceeding shall cite to supporting legal authorities."); *Cont'l Tech. Servs., Inc. v. Rockwell Int'l Corp.*, 927 F.2d

27

1198, 1199 (11th Cir. 1991) (noting parenthetically that an "issue raised perfunctorily without citation to authority constitutes waiver of [the] issue"); *Whitten v. Soc. Sec. Admin., Comm'r*, 778 F. App'x 791, 793 (11th Cir. 2019) ("For an issue to be adequately raised . . . , it must be plainly and prominently raised and must be supported by arguments and citations to the record *and to relevant authority.*" (citing *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014)) (emphasis added)).  The County Defendants' arguments for application of Georgia law as to waiver are not substantiated with citations to relevant authority and are, therefore, not compelling.

The County Defendants' arguments for application of Georgia law notwithstanding, both parties frame the waiver issue by citation to Federal Rule of Evidence 502(b).  *See* doc. 91 at 6, 13; doc. 96 at 7-8. Under Federal Rule of Evidence 502(b), disclosure of a confidential communication acts as a waiver of the privilege unless "(1) the disclosure is inadvertent; (2) the holder of the privilege or protection took reasonable steps to prevent disclosure; and (3) the holder promptly took reasonable steps to rectify the error, including (if applicable) following Federal Rule of Civil Procedure 26(b)(5)(B)."  *Id.*  "All three elements set forth in Rule

502(b) must be met to prevent a waiver of a privilege." *Liles v. Stuart Weitzman, LLC*, 2010 WL 11505149, at *2 (S.D. Fla. June 15, 2010) (citing *Heriot v. Byrne*, 257 F.R.D. 645, 654 (N.D. Ill. 2009)).  The County Defendants must shoulder the burden of proving that each element has been met.  *Id.*

The County Defendants argue they meet these three requirements. First, they argue the disclosure was inadvertent because the County Attorney himself did not "approve the release of the document," and instead, "staff accidentally released it unbeknownst to him."  Doc. 91 at 14.  They argue it was a staff "oversight" that the Creely Report was not removed from the production before it was sent.  *Id.*  Similarly, the Sheriff attests he "did not authorize the release of the reports that Dr. Ray prepared."  Doc. 91-2 at 4.  Next, they argue they took reasonable steps to prevent the disclosure because the County Attorney advised staff "that the document is protected by the attorney-client privilege."  Doc. 91 at 14.  Finally, they argue they acted promptly because the County Attorney had no knowledge the report was disclosed until a discovery dispute arose in which the County Attorney denied Plaintiffs' requests for Dr. Ray's reports.  *Id.* at 15.

As Plaintiffs rightly point out, the disclosure here was made by the Assistant County Attorney on behalf of the Sheriff in response to an open records request. *See* doc. 96 at 8. Although the Sheriff and the County Attorney both attest that the report should not have been released, absent any indication from the former Assistant County Attorney that she unintentionally released the report, it is unclear whether the disclosure was, in fact, inadvertent. Assuming it was, the record lacks any indication that the steps taken to prevent disclosure were reasonable. The County Attorney contends he "did not authorize" the report's release; however, he does not explain what steps he—or anyone else—took to ensure the report remained confidential. *See* doc. 91-1 at 4. There is no discussion or description of the procedure the County Attorney's office or the Sheriff's office utilizes when determining what documents to produce in response to an open records request. The conclusory statements that the document's release was "accidental" or "in error," *see* doc. 91-1 at 4, are not enough to demonstrate that the steps taken to prevent the error were reasonable. *See Liles*, 2010 WL 11505149, at *4-*5 (finding party failed to satisfy the second element of Rule 502(b) where it did not explain its efforts to check for, review, or

30

segregate privileged documents before producing them to the EEOC during its investigation).  The County Defendants have not carried their burden under Rule 502(b).

Additionally, *even if* the two reports were protected by either the attorney-client privilege or the work product doctrine, and *even if* the County Defendants did not waive the protections by disclosing the Creely Report during the pre-suit investigation, the County Defendants waived any potentially applicable protections to ***both*** reports by failing to properly document the privilege assertion on its privilege log.  *See* doc. 68-3.  As this Order has already pointed out, the County Defendants' privilege log is woefully deficient.  It does not include *any* reference to a claim of work product protection, does not adequately identify the documents at issue, and utterly fails to provide information sufficient to justify their assertion of the attorney-client privilege.  *See generally id.* Plaintiffs raise the issue numerous times throughout their briefing.  *See* doc. 88 at 2 n. 4; *id.* at 5-6; *id.* at 13 n. 7; doc. 96 at 3 n. 5.  In response, the County Defendants are silent.  *See generally* doc. 91.  They make no effort to defend the sufficiency of their existing privilege log or provide a more substantial, rule-compliant version.  *Id.*  The deficient privilege log

resulted in the Court expending unnecessary time parsing through the record to determine what documents were at issue.  Although the Court endeavored to do so to provide the parties with guidance so that this case can proceed, that does not mean the County Defendants' failures are excused.

Rule 26(b)(5) expressly requires a party asserting privilege to "describe the nature of the documents" not disclosed "in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(A)(ii).  "The party asserting the attorney-client privilege . . . bears the burden to provide a factual basis for its assertions.  This burden is met when the party produces a detailed privilege log stating the basis of the claimed privilege for each document in question, together with an accompanying explanatory affidavit from counsel." *Meade*, 250 F. Supp. 3d at 1393 (quoting *Carnes v. Crete Carrier Corp.*, 244 F.R.D. 694, 698 (N.D. Ga. 2007)).  The County Defendants did not sustain their burden.  "The court may impose as a sanction the waiver of privilege for . . . failing to provide an adequate privilege log in compliance with Rule 26." *Id.*  If the two reports were protected at any point, which, as explained above, they

weren't, the County Defendants' failure to provide an adequate privilege log would result in a waiver of such protections.

For all of the foregoing reasons, Plaintiffs' Motion to Compel the County Defendants is **GRANTED, IN PART**.  Doc. 88, in part.  The Creely Report and the 2019 Inmate Mortality Report are discoverable. Additionally, Plaintiffs may depose Dr. Ray.  During the deposition, the County Defendants remain free to raise any objections to specific questions they believe seek protected information pursuant to Federal Rule of Civil Procedure 30(c)(2).  Plaintiffs may also explore Chatham County's contract with Dr. Ray during the County's 30(b)(6) deposition, and the County Defendants may object to any specific questions they believe may seek protected information pursuant to Rule 30(c)(2).

## III.   MOTION TO COMPEL CORRECT HEALTH (Doc. 90)

### A.   Documents at Issue

Plaintiffs' discovery dispute with the CorrectHealth Defendants centers on those Defendants' assertion of attorney-client privilege and attorney work product over six documents identified on their First Supplemental Privilege Log.  *See* doc. 92-4; *see also* doc. 92 at 3.  The CorrectHealth Defendants have provided the documents to the Court for

an *in camera* inspection.[9]   The documents include: (1) four emails between a CorrectHealth employee, Dr. Anuj Goel, and the CorrectHealth Chief Legal Officer and General Counsel, Stacy Scott, identified as documents 7, 8, 9, and 10; (2) a typed statement provided by Dr. Goel to Ms. Scott, identified as document 12; and (3) a "Redacted Quality Assurance/Morbidity & Mortality Review" prepared by Ms. Scott, identified as document 15.  *Id.*  The CorrectHealth Defendants assert the attorney-client privilege over all six documents.  *Id.*  They also assert work product protections over document 8, an email from Ms. Scott to Dr. Goel, and document 15, Ms. Scott's Redacted Quality Assurance/Morbidity & Mortality Review.  *Id.*

### B.   Analysis

#### 1.   *Communications Between Dr. Goel and Ms. Scott (Documents 7, 8, 9, 11 & 12)*

The email communications identified as documents 7, 8, 9, and 11, and an attachment to one of those emails identified as document 12, are protected by the attorney-client privilege.  Defendants explain that Dr. Goel emailed Ms. Scott in her capacity as CorrectHealth's lawyer "in

---

[9] The Clerk is **DIRECTED** to maintain copies of the documents provided by the CorrectHealth Defendants for *in camera* inspection on the docket sealed and *ex parte*.

order to obtain legal advice following Mr. Creely's death." Doc. 92 at 4 (discussing document 7). In the email identified as document 8, Scott responds "by providing legal advice." *Id.* Dr. Goel responded in two subsequent emails, documents 9 and 11. *Id.*; *see also* doc. 92-4 at 2. In one of those emails, he attaches a separate document, identified as document 12, providing Ms. Scott with additional information she requested. Doc. 92 at 4; *see also* doc. 92-4 at 2. A review of the documents, submitted for *in camera* inspection, confirms these characterizations. Notably, Plaintiffs do not appear to challenge the CorrectHealth Defendants' assertion of privilege over these communications. *See generally* doc. 90; *see also* doc. 92 at 4 n.4.

"It is undisputed that the attorney-client privilege protects disclosures made by a client to his attorney, in confidence, for the purpose of securing legal advice or assistance." *Knox v. Roper Pump Co.*, 957 F.3d 1237, 1248 (11th Cir. 2020) (citing *Cox v. Admin. U.S. Steel & Carnegie*, 17 F.3d 1386, 1414 (11th Cir. 1994)). Dr. Goel's emails to his company's in-house counsel, which did not copy any additional recipients, and the lawyer's response to him, which also did not copy any additional recipients, made for the purpose of seeking and giving legal advice, fall

under the privilege. *See Upjohn Co. v. United States*, 449 U.S. 383, 394-95 (1981) (recognizing the attorney-client privilege attaches to communications made by corporate employees to corporate counsel "in order to secure legal advice"). To the extent the Plaintiffs' Motion to Compel seeks production of the emails and statement identified as documents 7, 8, 9, 11, & 12 on the CorrectHealth Defendants' privilege log, it is **DENIED, IN PART**. Doc. 92, in part.

### 2.    *Ms. Scott's Redacted Quality Assurance/Morbidity & Mortality Review (Document 15)*

Plaintiffs' Motion to Compel focuses on the document titled "Redacted Quality Assurance/Morbidity & Mortality Review" and identified as document 15 on the CorrectHealth Defendants' privilege log. *See* doc. 90 at 9-15; doc. 92-4 at 2. The privilege log claims the document is attorney-client privileged and protected attorney work product. Doc. 92-4 at 2. The CorrectHealth Defendants produced a heavily redacted version of the document to Plaintiffs, *see* doc. 90-13, and have provided an unredacted copy for the Court's *in camera* review. The CorrectHealth Defendants have also provided an affidavit from Stacy Scott, the company's Chief Legal Officer, in support of their claims of privilege and work product over the document. *See* doc. 92-6.

36

Plaintiffs argue they are entitled to the document because mortality reviews are completed, pursuant to CorrectHealth policy, after any inmate death "to determine the appropriateness of clinical care." Doc. 90 at 9. Because the reviews are done after all deaths, and not "only if litigation is anticipated," Plaintiffs argue they are not privileged or protected, even when drafted or reviewed by an attorney. *Id.* at 10-11. They also argue that CorrectHealth can have no reasonable expectation of confidentiality as to mortality reviews, because these types of reviews are "repeatedly the subject of litigation" and are "continually ordered to be disclosed." *Id.* at 12.

The CorrectHealth Defendants respond that the "Facility Mortality Review" contemplated by the policies cited by Plaintiffs has been produced in discovery. *See* doc. 92 at 2-3; *see also* doc. 92-2 (Facility Mortality Review); doc. 92-3 (letter to Plaintiffs' counsel providing, among other things, the "Mortality Review). In her affidavit, Scott distinguishes between her "medical timeline," which is being withheld (at least in its unredacted form), and the already produced "Facility Mortality Review" which is the type "done pursuant to CorrectHealth's contract with Chatham County, [and] are completed by CorrectHealth as

a matter of course following inmate deaths to address any concerns with clinical care and improve future care." Doc. 92-6 at 5. The CorrectHealth Defendants argue Scott's timeline "is not part of the Facility Mortality Review conducted following Mr. Creely's death." Doc. 92 at 3.

Scott explains she created the "medical timeline" following her "review and analysis of the relevant documents (including the medical chart) concerning Lee Michael Creely's incarceration at the Chatham County Detention Center . . . ." Doc. 92-6 at 4. She contends she prepared the document at a time when she "anticipated that there would be litigation arising out of the death of Creely," an anticipation only strengthened by news coverage of his death and open records act requests. *Id.* She further contends she created it using her "legal training, education, experience, skills, and knowledge" and it "reflects [her] mental impressions." *Id.* She intended for this document to remain confidential, as it was done as part of her own internal investigation to gather "information needed to defend the company if and when legal action was taken." *Id.* at 3-4.

The CorrectHealth Defendants argue Scott's "timeline" is "pure work product of the company's attorney, created in anticipation of

litigation." Doc. 92 at 5-6. As a refresher: "[o]rdinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." Fed. R. Civ. P. 26(b)(3). The CorrectHealth Defendants have sufficiently explained how and why Scott's timeline document was created to justify protecting it under Rule 26(b)(3). *See* doc. 92 at 5-8; *see also* doc. 92-6. As they explain, "[w]hen attorney Scott created the medical timeline, she used the legal training, education, experience, skills, and knowledge she acquired since law school and honed over the course of her career as an attorney to review and summarize the records and crate a timeline of the events *that she perceived were relevant and important*." Doc. 92 at 4 (emphasis added). Plaintiffs have not filed a reply to refute the argument, *see generally* docket, and their initial brief is premised on their incorrect belief that the withheld document was part of the Facility Mortality Review, *see generally* doc. 90. Document 15 contains the mental impressions of CorrectHealth's Chief Legal Officer and was prepared after she anticipated litigation; it is, therefore, protected from production. *See*

39

*Hickman*, 329 U.S. at 510-11; *see also* Rule 26(b)(3).  Plaintiffs' Motion to Compel is **DENIED, IN PART**.  Doc. 90, in part.

## IV.   CONCLUSION

Plaintiffs' Motion to Compel the County Defendants is **GRANTED**. Doc. 88.  Plaintiffs' Motion to Compel the CorrectHealth Defendants is **DENIED**.  Doc. 90.  The discovery stay is lifted.  *See* doc. 72 at 1-2.  The parties are **DIRECTED** to jointly file a renewed Rule 26(f) Report proposing deadlines for the remainder of discovery in this case, as previously ordered.  *Id.* at 2.

**SO ORDERED** this 6th day of July, 2023.

CHRISTOPHER L. RAY
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA